In the

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

_____

Docket No. 25-1911

_____

UNITED STATES OF AMERICA

-against-

MICHAEL HEALY

*Appellant*

_____

On Appeal From
The United States District Court of New Jersey
Sat Below: Michael E. Farbiarz, U.S.D.J.

## APPELLANT MICHAEL HEALY

## BRIEF ON APPEAL

**Stephen Turano**
**Turano Law**
60 Park Place, Suite 1101
Newark, NJ 07102
(973) 648-6777

*Attorney for Appellant*
Michael Healy

TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................V

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.......1

STATEMENT OF ISSUES ....................................................................................2

CONSICE STATEMENT OF THE CASE ...........................................................6

    I.Procedural History.................................................................................6

    II.Statement of Facts................................................................................7

SUMMARY OF ARGUMENT..............................................................................15

STANDARD OF REVIEW ..................................................................................20

    I.THE ANONYMOUS AND SEQUESTERED JURY DEPRIVED HEALY OF A FAIR TRIAL .................................................................................22

        A.The Measures Lacked Required Case-Specific Justification ...............23

        B.The Procedures Communicated Presumed Dangerousness and Were Not Neutralized..................................................................................24

        C.Lack of Curative Instruction Rendered the Error Not Harmless.........25

II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN ALLOWING THE GOVERNMENT TO PRESENT HIGHLY INFLAMMATORY AND PREJUDICIAL EVIDENCE THAT HEALY WAS A "RANKING MEMBER" OF THE TREE TOP PIRU SUBSET OF THE BLOODS........26

i

A. Tree Top PIRU Was Not the Charged Enterprise ................................26

B. The Government's Proof Did Not Match Its Tree Top Theory ...........27

C. The Court's Ruling Forced a Prejudicial Stipulation ..........................29

D. The Tree Top Evidence Was Propensity-Driven and Unfairly

Prejudicial ..................................................................................................30

III. THE COURT VIOLATED THE CONFRONTATION CLAUSE BY
ADMITTING TESTIMONIAL HEARSAY ................................................32

A. Testimonial Hearsay Through Officer Weeks and the

Nunez Statement ....................................................................................33

   1. Nunez's Statements Were Inadmissible Under Rule 801(d)(2)(E)

   and This Court's Precedent ..................................................................34

   2. The Admission Was a Direct *Crawford* Violation ..........................35

   3. The Testimony Was Also Prejudicial Double Hearsay ....................35

B. The Court Allowed Additional Agent "Narrative" Hearsay Through

Special Agent Frederick in Violation of *Ammar* and Confrontation

Principles ................................................................................................36

IV. THE COURT ALSO VIOLATED THE CONFRONTATION CLAUSE BY
MISAPPLICATION OF FORFEITURE BY WRONGDOING AND
BOOTSTRAPPING UNDER RULE 801(D)(2)(E) ....................................40

A. Hearsay Through Gregory Drozjock Highlights the Structural Error .......44

   1. These Confrontation Violations Were Not Harmless .....................45

V. THE DISTRICT COURT'S RESTRICTIONS ON IMPEACHING
MORALES WITH HIS GRAND JURY TESTIMONY VIOLATED THE
CONFRONTATION CLAUSE AND WERE NOT HARMLESS ...............46

A. Legal standard ...................................................................47

B. Morales Was The Linchpin Witness; His Credibility Was Central ........48

C. The Court Curtailed Non-Collateral Impeachment ...............................49

With Morales's Grand Jury Testimony .......................................49

    1. Orange Park Meeting ................................................49

    2. Timing of Morales's knowledge that "the wrong guy was shot" ....50

    3. Use of "C-Dot" as an identification for Mr. Healy .........................51

    4. Statiroudis Shooting Alleged Facts And Shooter Positions............52

VI.    THESE LIMITATIONS MATERIALLY UNDERMINED HEALY'S RIGHT TO CONFRONT THE KEY WITNESS AGAINST HIM, AND THE ERROR WAS NOT HARMLESS ....................................................................53

VII.    THE GOVERNMENT VIOLATED *BRADY* AND RULE 16 BY WITHHOLDING COOPERATING WITNESS ROBINSON'S CELL-PHONE RECORDS TILL THE EVE OF TRIAL ............................55

VIII.    THE RECENT SUPREME COURT RULING IN *BARRETT V. UNITED STATES* REQUIRES THAT CUMULATIVE CONVICTIONS AND SENTENCES UNDER  18 U.S.C. 924(C) AND 924(J) MUST BE VACATED ......................................................................................58

IX.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN JURY INSTRUCTIONS ON RICO CONSPIRACY AND MURDER IN AID OF RACKETEERING..............................................................................60

X.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN  A VICAR CONVICTION FOR THE KILLING OF JUAN MARTINEZ .......63

A. VICAR Requires a Purpose to Maintain or Increase Position .................63

B. Juan Martinez Was Not Killed for Any Enterprise-Related Purpose ........63

C. The "Collateral Damage" Theory Improperly Relied on Foreseeability and Transferred Intent ..................................................................................63

D. .... The Government Failed to Prove That Healy Ordered or Committed the Killing of Juan Martinez..................................................................................64

E. Allowing the Martinez VICAR Conviction to Stand Would Expand § 1959 Beyond Its Limits ..................................................................................65

XI.     THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE GUILT BEYOND A REASONABLE DOUBT ..........................................................65

A. Governing Standard and the Nature of the Government's Proof ..............65

B. No Direct Evidence Linking Healy to the Killings ..................................66

C. The Case Turned on Cooperators and Uncorroborated Second-Hand Accounts ..................................................................................................67

D. Improperly Admitted Hearsay Cannot Supply Essential Elements...........70

E. Impermissible Inference-Stacking Enabled by Forfeiture Bootstrapping .70

F. Law-Enforcement Testimony Supplied Narrative, Not Proof....................71

G. The Erroneous Forfeiture Ruling Cannot Salvage an Otherwise Insufficient Record ..................................................................................72

XII.    THE DISTRICT COURT'S RESTRICTION ON DEFENSE SUMMATION VIOLATED THE RIGHT TO COUNSEL AND A FAIR TRIAL ................73

CONCLUSION ..................................................................................................74

CERTIFICATE OF COMPLIANCE ..................................................................75

APPENDIX..........................................................................................................76

iv

TABLE OF AUTHORITIES

<u>Supreme Court Cases</u>

*Alford v. United States*, 282 U.S. 687 (1931)…………………………………………..48

*Barrett v. United States*, 607 U.S. ___ (2026)..……………………………….58,59,60

*Bourjaily v. United States*, 483 U.S. 171 (1987)……………...………….16, 41

*Brady v. Maryland*, 373 U.S. 83 (1963)…………………...3,6,18,21,55,56,57,58

*Brown v. Ohio*, 432 U.S. 161 (1977)……………………….…...19,58,59,60

*Burks v. United States*, 437 U.S. 1 (1978)……………………………….…..68,72

*Chapman v. California*, 386 U.S. 18 (1967)…………….…16,30,22,26,39,45,54,61

*Crawford v. Washington*, 541 U.S. 36 (2004)…………….…13,15,16,32,35,38,45,72

*Delaware v. Fensterer*, 474 U.S. 15 (1985)……………….…………………….49

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)…..…………………………….39,46

*Giglio v. United States*, 405 U.S. 150 (1972)..……………………..….18,21,56,58

*Giles v. California,* 554 U.S. 353 (2008)………………13,15,20,40,41,42,45,70,72

*Herring v. New York*, 422 U.S. 853 (1975)……………..……………….19,22,73

*Jackson v. Virginia*, 443 U.S. 307 (1979)..…………………………….19,22,73

*Kyles v. Whitley*, 514 U.S. 419 (1995)..…………………………19,21,64,65,67,69,72

*Old Chief v. United States*, 519 U.S. 172 (1997)..………………………….29,30

*Olden v. Kentucky*, 488 U.S. 227 (1988)………………………………………….47

*United States v. Turkette*, 452 U.S. 576 (1981)………………………………...60

<u>Third Circuit Cases</u>

*Dennis v. Sec'y, Pa. Dep't of Corr*., 834 F.3d 263 (3d Cir. 2016)…………………58

*United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983)…..……………………..…….2,16,20,28,34,3637,38,39,41,42,45,70,72

*United States v. Antar*, 53 F.3d 568 (3d Cir. 1995)…………….…….….……..18,60

*United States v. Baskerville*, 448 F.3d 207 (3d Cir. 2006)……..……….……...20,42

*United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012)……..…….…………20,38,39

*United States v. Bergrin*, 650 F.3d 257, 268–69 (3d Cir. 2011)……………….…...61

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc)…………………………………….………..…..19,21,65,66,67,69,71,72

*United States v. Carter*, 410 F. App'x 629 (3d Cir. 2011)…..……………….27,30,32

*United States v. Chandler*, 326 F.3d 210 (3d Cir. 2003)……..……………….48,53

*United States v. Chorin*, 322 F.3d 274 (3d Cir. 2003)…………….……………60

*United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019)………………………..65

*United States v. Green*, 617 F.3d 233 (3d Cir. 2010)……………………………...50

*United States v. Hill*, 976 F.2d 132 (3d Cir. 1992)……………….……………..22

*United States v. Hinton*, 423 F.3d 355 (3d Cir. 2005)……………………………..22

*United States v. Jones*, 566 F.3d 353, 365–66 (3d Cir. 2009)……..…….……..32,35

*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001)………………..18,26,28,30,32

*United States v. Miller*, 527 F.3d 54 (3d Cir. 2008)..……………………20.23,24

*United States v. Mussare*, 405 F.3d 161 (3d Cir. 2005)…………………………...51

*United States v. Provenzano*, 620 F.2d 985 (3d Cir. 1980)………………………..34

*United States v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990)……….…………….60

*United States v. Riccobene*, 709 F.2d 214 (3d Cir. 1983)……………………….60

*United States v. Rigas*, 605 F.3d 194 (3d Cir. 2010)……………………………...59

*United States v. Salahuddin*, 765 F.3d 329 (3d Cir. 2014)..………………….22

*United States v. Scarfo*, 850 F.2d 1015 (3d Cir. 1988)..…………….……17,20,23,24

*United States v. Urban*, 404 F.3d 754 (3d Cir. 2005)…………………………19,63,65

*United States v. Weatherly*, 525 F.3d 265 (3d Cir. 2008)……………………………22

Other Circuit Cases

*United States v. Banks*, 514 F.3d 959, 965 (9th Cir. 2008)………………………….64

*United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004)………………………………….63

*United States v. Pimentel*, 346 F.3d 285, 295–96 (2d Cir. 2003)………………….64

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994)………...…………………...19,63

*United States v. Scott*, 284 F.3d 758 (7th Cir. 2002)………………………….....42


State Cases

*State v. Silva*, 621 A.2d 17 (N.J. 1993)………………………………………....52


Statutes

18 U.S.C. § 924(c)……………………………….………....1,3,19,58,59,60

18 U.S.C. § 924(j)………………………………………….……1,3,19,58,59,60

18 U.S.C. § 1959(a)……………………………………….……1,3,61,62,63,64,65

18 U.S.C. § 1962(d)………………………………….…………………1,3,60,61,62


Rules

Fed. R. Crim. P. 16………………………………………..3,18,21,55,56,58,59

Fed. R. Evid. 613…………………………………………..……………15,48

Fed. R. Evid. 801(d)(2)(E)........................10,16,28,34,36,38,39,40,41,43,44,45,70

Fed. R. Evid. 804(b)(6)……………………………………..41,42,43

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

On April 3, 2004, following a jury trial in the United States District Court for the District of New Jersey, the jury convicted defendant Michael Healy of multiple federal criminal offenses, including 18 U.S.C. §§ 1962(d), 1959(a)(1), 924(c), 924(j), 922(g)(1); 21 U.S.C. § 846 and 18 U.S.C. § 2. AP 26 (Superseding Indictment). On August 1, 2025, the district court-imposed sentence and entered a final judgment of conviction, disposing of all claims as to Healy. AP 56.

On May 8, 2025, Healy timely filed a notice of appeal from the final judgment. AP 63 (Notice of Appeal). The district court exercised subject-matter jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF ISSUES**

I.   Whether the district court abused its discretion and violated the Fifth and Sixth Amendments by empaneling an anonymous, partially sequestered jury, requiring Healy to be shackled, and employing heightened security measures without the required case-specific findings and neutralizing instructions thereby eroding the constitutional presumption of innocence.

II.   Whether Healy was denied a fair trial because the Government was permitted to present highly inflammatory gang-affiliation evidence that Healy was a "ranking member" of the Tree Top PIRU subset of the Bloods, even though Tree Top PIRU was not the charged enterprise and the Government failed to show any non-prejudicial, evidentiary nexus between that status and the elements of the offenses.

III.   Whether the Confrontation Clause was violated by admitting extensive testimonial hearsay based on an erroneous forfeiture-by-wrongdoing ruling and by misapplying the co-conspirator exception, thereby allowing hearsay to supply essential elements of the Government's case, and whether these hearsay rulings also contravened this Court's decision in *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983).

IV. Whether the jury instructions on RICO conspiracy under 18 U.S.C. § 1962(d) and murder in aid of racketeering under 18 U.S.C. § 1959(a) misstated the law—particularly the agreement and purpose elements—and impermissibly lowered the Government's burden of proof on the most serious counts.

V. Whether the Confrontation Clause was violated and reversible error committed by restricting Healy from impeaching key cooperator Darnell Morales with his prior grand jury testimony on central, non-collateral matters, thereby preventing the jury from hearing the most significant inconsistencies in the only witness who directly tied Healy to the Martinez and Statiroudis homicides.

VI. Whether the Supreme Court's recent decision in *Barrett v. United States* requires reversal of the cumulative convictions on the § 924(c) and § 924(j) counts.

VII. Whether the Government violated its constitutional obligations under *Brady* and *Giglio* and its continuing duty of prompt disclosure under Rule 16(c) by withholding cooperating witness Matthew Robinson's historical cell-site and usage records.

VIII. Whether the evidence was legally insufficient to sustain the VICAR conviction for the killing of Juan Martinez.

3

IX.    Whether the evidence, limited to properly admissible proof, was legally insufficient to sustain Healy's convictions, especially the VICAR counts, where the Government presented no physical or forensic evidence tying him to the killings and relied instead on uncorroborated, incentive-laden cooperator testimony and inference-stacking.

X.    Whether restriction on time limit of the defense closing argument in an exceptionally long, complex trial carrying multiple life-equivalent sentences violated Healy's Sixth Amendment right to effective assistance of counsel and a fair opportunity to respond to the Government's case.

XI.    Whether the cumulative effect of these constitutional and evidentiary errors requires reversal of Healy's convictions.

## <u>STATEMENT OF RELATED CASES</u>

This matter has not previously been before this Court, and counsel is not aware of any cases related to this appeal presently pending before the Court.

**CONSICE STATEMENT OF THE CASE**

## I.    Procedural History

On November 21, 2018, a grand jury in the District of New Jersey returned an indictment charging Michael Healy with a narcotics conspiracy in violation of 21 U.S.C. § 846. AP 28. On October 26, 2023, Healy was superseded with Indictment (S-2), That indictment alleged from roughly 2013 through early 2019, Healy led the "Healy Drug Trafficking Enterprise," ("Healy DTE") a New Jersey-based narcotics and racketeering organization that obtained multi-kilogram quantities of controlled substances from California, transported them to New Jersey, and used stash houses to process and distribute the drugs. AP 28. Layered on top of this gang and drug narrative was an even more inflammatory set of allegations that Healy allegedly used intimidation and violence to silence perceived cooperators. Specifically, in early 2018 Healy arranged the killing of Aristides "Teddy" Statiroudis because he was believed to be cooperating but an innocent bystander, Juan Martinez was killed. About a month later, Statiroudis himself was killed. AP 28. The Indictment further alleged that Healy later caused the killing of Jose Colon based on a belief that Colon might be cooperating. AP 28.

Before trial, Healy filed multiple motions seeking disclosure of exculpatory and impeachment material under *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence of third-party culpability and alternative drug-trafficking organizations. AP

6

64. The Government opposed those motions. The district court denied or significantly limited relief. AP 110, 112.The defense also filed several motions *in limine*.

Prior to jury selection, the district court ordered that the jury be empaneled as an anonymous, partially sequestered and imposed unusual transport and contact restrictions. AP 132. The district court also required Healy to be in leg shackles, concealed by a curtain at counsel table. AP 580.

Trial commenced on March 4, 2024. Over defense objection, the district court admitted extensive gang-affiliation evidence, The district court also placed strict limits on defense summation and denied a defense request for a brief extension of closing time. AP 2762.

On March 28, 2024, the district court issued final jury instructions AP 141, and the jury returned guilty verdicts on all counts submitted. The district court later entered forfeiture orders and judgment AP 280, sentencing Healy to multiple life-equivalent terms. Healy timely filed a notice of appeal.

## II.    Statement of Facts

This trial did not rest on reliable, admissible proof; it rested on allegations. The Government's unproven allegations—that Michael Healy led a violent Bloods-affiliated drug enterprise and ordered the murder of a federal informant—effectively displaced evidence at every stage, driving extraordinary security

measures, expansive hearsay and forfeiture-by-wrongdoing rulings, and a fear-laden atmosphere that deprived Healy of the fair trial the Constitution guarantees.

What should have remained unproven allegations quickly hardened into operative "facts" driving the court's rulings. In its ruling on security and admissibility, the court repeatedly cited the indictment's account of the Martinez shooting—along with co-defendant plea allocutions and Government proffers "subject to connection"—as "overwhelming evidence" that Healy weaponized murder to obstruct justice. AP. 132.

The district court empaneled an anonymous and partially sequestered jury. The jurors were identified only by number, transported under special security protocols, and shielded from public identification. AP Tr. 371, 720, 726. Healy was required to be in leg shackles at counsel table, with a curtain erected to conceal the restraints as much as possible. I. These extraordinary measures were justified not by case-specific evidence that Healy himself posed an actual risk, but once again the seriousness of the charges and the indictment's narrative.

Prior to trial, the defense moved *in limine* to preclude the Government from admitting irrelevant and prejudicial hearsay that Healy became a ranking member of the Tree Top PIRU set of the Bloods while incarcerated, arguing that this alleged status was unduly prejudicial and unrelated to the charged Healy DTE enterprise. AP 113. The defense argued that Tree Top PIRU was a separate California-based

8

gang and that the indictment's bare allegation that Healy "used his leadership status in the Tree Top PIRU Bloods to assist him with obtaining suppliers, recruiting and controlling enterprise members, and otherwise conducting the Healy DTE's operations" was not borne out by any disclosed proof, as no Tree Top PIRU member was expected to testify that Healy held such a leadership role or used it to run the alleged New Jersey enterprise. The defense further contended that any attempt to prove these points through non-Tree Top witnesses such as local Mob PIRU member Darnell Morales would rest on inadmissible hearsay and speculation, noting that Morales admitted he lacked personal knowledge of Tree Top PIRU's internal hierarchy and that the Government never produced the "Piru book" he claimed would formally record membership and rank.

The district court nevertheless denied the motion and allowed the Government to proceed on its Tree Top theory, forcing the defense to mitigate the resulting prejudice by stipulating that Healy became a ranking member of the Tree Top PIRU set while incarcerated. A concession made solely to avoid even more inflammatory gang testimony under the court's ruling. The overwhelming prejudice forecasted by the defense became reality at trial. The Government relied almost exclusively upon the defense stipulation. The only other evidence presented was an Instagram post and improper testimony by Case Agent Frederick that Healy was a "member of the Bloods set called the Tree Top Pirus." AP 630.

9

The treatment of the proposed testimony of Aristides "Teddy" Statiroudis illustrates the extent to which allegation displaced proof. Because Statiroudis was deceased, he could not testify.  Tr. 437 Statiroudis, was a long-time New Jersey narcotics trafficker who operated a drug-distribution network based out of his residence at 293 Ampere Parkway in Bloomfield. Tr. 438-440. By 2017, he had prior felony convictions, including arson, firearms, drug-distribution, and gambling offenses, and was the target of multiple state and local narcotics investigations. After Bloomfield police and DEA agents executed a June 9, 2017 search warrant at his home and recovered cocaine, oxycodone, cash, and drug paraphernalia, Statiroudis agreed to cooperate as a confidential informant, providing information about suppliers and arranging controlled meetings for law enforcement. Tr. 438-440. While he was working with the DEA, the Government alleges that Michael Healy ordered Statiroudis's March 2018 shooting because Statiroudis was cooperating with authorities.

The district court permitted extensive testimony regarding what others claimed Statiroudis had told them about cooperation, threats, and motives, and these second-hand accounts became central to the Government's theory of Healy's knowledge and intent. The district court admitted this testimony under forfeiture-by-wrongdoing and Rule 801(d)(2)(E), even though the predicates for those rulings rested on the same untested hearsay and indictment narrative cannot

10

substitute for confrontation or reliable proof. The district court accepted the Government's assertion that Healy "made repeated and calculated use of murder" to undermine the truth-seeking process, relying on the indictment, plea allocutions, and proffers rather than testimony subject to cross-examination. There was no reliability hearing. As a result, those materials were relied upon as sufficient to establish the specific intent that forfeiture by wrong doing requires, then used that forfeiture finding to admit broad swaths of testimonial hearsay from and about Statiroudis— using hearsay to prove forfeiture, and forfeiture to admit more hearsay.

Still, the Government never proved with reliable evidence that Healy knew Statiroudis was cooperating before his death. There was no reliable evidence. No texts, recordings, surveillance, or documents showing that anyone told Healy that Statiroudis was an informant— just inadmissible hearsay. Nonetheless, the district court permitted a non-coconspirator houseguest of Statiroudis, Gregory Drozjock, to recount neighborhood gossip that he heard while staying at Statiroudis home at 293 Ampere Parkway. Drozjock testified that he heard Statiroudis "…talking to the DEA," that "others" accused Statiroudis of cooperating, and that Statiroudis protested "I'm no rat." AP 1020-1023. The Government treated this stacked hearsay as proof that Healy believed Statiroudis was an informant.

Disclosure violations further undermined a case that relied upon a fear-based narrative. The Government produced critical 3500 for Officer Weeks after he

11

testified depriving the defense of a fair opportunity to integrate into its trial strategy. The defense moved for a mistrial. The district court denied that motion and offered a curative instruction, but the damage was done. In a case built on cooperators and hearsay, the bell could not be unrung.

*Voir dire* showed how the Government's allegations and heavy security measures effected the venire and denied Healy a fair trial. Prospective jurors voiced fear and unease about serving on a "gang case." Juror 20, in particular, stated that "the gang thing" was "a little bit…a little scary to be part of a jury" and volunteered that he would feel safer "if it was an anonymous thing." AP 512-515. Rather than dispel the notion that anonymity signaled danger specific to Healy, the district court reassured him that "the security of this building…is handled by professionals," reinforcing the perception that extraordinary security was in fact warranted. AP 513. Ultimately Juror 054 became part of the jury panel. [1] AP 514. The court chose not to give a neutral explanation detaching anonymity from any inference about Healy's character, leaving jurors free to treat anonymity and security as confirmation that they were being protected from the defendant.

The anonymous, heavily secured courtroom signaled to jurors that the defendant was dangerous. The Confrontation Clause gave way to forfeiture rulings

---

[1] In contrast, Juror 006 who expressed distrust of cooperating witnesses was dismissed from the panel.

anchored in untested proffers and indictment rhetoric, in tension with *Crawford* and *Giles*. *Crawford v. Washington*, 541 U.S. 36 (2004) and *Giles v. California*, 554 U.S. 353 (2008). The RICO and VICAR instructions lowered the *mens rea* burden on core counts. And in a multi-week trial carrying a life sentence, the court refused the defense a modest ten-minute extension of closing argument, truncating its only chance to synthesize for the jury the weaknesses in the Government's fear-driven case.

The result was a trial in which the allegations themselves—murder of an informant and an innocent bystander, and a gang-run drug enterprise—became self-validating. Fear did not simply surround the proceedings; it structured them. It drove security decisions, shaped evidentiary and forfeiture rulings, and colored how jurors received and interpreted the Government's case. That is irreconcilable with a system that promises a presumption of innocence and proof beyond a reasonable doubt.

At trial the case rested almost entirely upon cooperating witnesses. The district court's rulings permitted cooperating witnesses to testify without consequence. Darnell Morales the Government's central witness to its theory of the case against Healy was allowed to drastically change his testimony at trial. At trial, Morales's account of the Statiroudis shooting diverged in multiple material respects from what he told the grand jury, underscoring the unreliability of his version of events. In his

13

November 14, 2018 grand jury testimony, Morales told the grand jurors there were "40, 50" Mob Piru members at the Orange Park meeting and an equal number of Brick City Brims present. AP 315. Yet at trial he reduced that to "20-plus," dismissing his sworn estimate as "years ago." Morales described Thomas "Lil Baby" Zimmerman's vehicle to the grand jury as a "black SUV-type car," yet at trial insisted it was a black sedan. AP 333. In the grand jury, Morales stated that gunfire from Zimmerman's car appeared to come from the driver's side area and that Zimmerman was shooting "to the left," over the driver's side, but at trial he testified that Zimmerman shot out of the sunroof toward the passenger side and claimed not to recall telling the grand jury otherwise, even when confronted with the transcript. AP 342. Morales also told the grand jury that, while still in the burgundy Impala with Terry "T-Rose" Grovesnor, Samir "Mir" Floyd, and Armani "Mani" Tyndale. AP 321 he learned via a call from Tyree "Hell Boy" Thomas that "you shot the wrong guy," whereas at trial he shifted that realization to "days later" and again professed a lack of memory when his prior sworn testimony was shown to him. AP 346.

Morales placed the mandatory Orange Park meeting called by Thomas at 1:00 p.m. and suggested a relatively tight chain of travel from Orange Park to East Orange to Bloomfield before the 6:40 p.m. homicide. AP 336. Although defense counsel repeatedly sought to confront Morales with these prior sworn statements, the district court curtailed that effort—sustaining form and Rule 613 objections, refusing to

14

allow key grand jury passages to be read or published, and expressly finding that "the impeachment has not been perfected," thereby preventing the jury from hearing the full scope of Morales's prior inconsistent statements. AP 1505-1508. Taken together, the substantive inconsistencies between Morales's grand jury testimony and his trial testimony was compounded by the court's refusal to permit proper impeachment with those prior statements and provide substantial reasons to question the accuracy and credibility of his testimony.

## SUMMARY OF ARGUMENT

Healy was convicted and sentenced to multiple life terms after a trial in which fear, allegation, and narrative displaced the constitutional safeguards of confrontation, due process, and the presumption of innocence.

The testimonial hearsay was admitted in violation of the Confrontation Clause. Under *Crawford v. Washington*, 541 U.S. 36, 53–54, 68 (2004), testimonial statements—such as formal law-enforcement interviews—are inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine. *Giles v. California,* 554 U.S. at 353 (2008) permits forfeiture of confrontation rights only where the Government proves the defendant acted with the specific purpose of preventing testimony. *Id*. Here, hearsay was permitted through forfeiture by wrong doing. The forfeiture by wrong doing ruling opened the door to "testimony from the grave" and expanded agent-narrative evidence, which the

15

Government in turn invoked as substantive proof of Healy's knowledge and purpose. This unreliable and untested evidence was admitted in violation of the Confrontation Clause and cannot be used to uphold the convictions against Healy. *Crawford*, 541 U.S. at 68, *see also, Chapman v. California*, 386 U.S. 18, 24 (1967). Allowing the Government to manufacture sufficiency by first relaxing evidentiary rules and then pointing to the resulting record as "proof" would invert the purpose of the right to confrontation.

The hearsay rulings contravened precedent on co-conspirator statements. *United States v. Ammar*, 714 F.2d 238, 247–49 (3d Cir. 1983) requires independent evidence of a conspiracy, the defendant's membership, and an "in furtherance" purpose before admitting Rule 801(d)(2)(E) statements. Hearsay cannot be used to bootstrap its own admissibility. The district court inverted this order, relying on hearsay as the principal proof of the very conspiracies that justified admitting more hearsay—precisely the bootstrapping that *Ammar* and *Bourjaily* forbid. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987) and *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983).

In violation of the Confrontation Clause, the district court substantially curtailed Healy's ability to impeach key cooperator Darnell Morales with his own grand jury testimony on core, non-collateral issues, including the scope and character of the Orange Park meeting (where Healy allegedly ordered the killing of

16

Statiroudis), when and how he learned that "the wrong guy" was shot, and the basic facts of the Statiroudis shooting. Although a trial court has latitude to manage cross-examination, it may not foreclose a proper and important line of inquiry bearing directly on the credibility of the witness whose testimony is central to the prosecution's case. Here, by repeatedly blocking the defense from deploying Morales's prior sworn statements in the ordinary, impactful way contemplated by the rules of evidence, the court denied Healy a meaningful opportunity for effective cross-examination and left the jury with a sanitized account of the only witness who tied him to both homicides, an error that cannot be deemed harmless beyond a reasonable doubt.

The extraordinary security measures—an anonymous, partially sequestered jury, shackling, and heightened security—were implemented without the case-specific necessity findings required, and without a neutral explanation to reduce any inference of dangerousness. *United States v. Scarfo*, 850 F.2d 1015, 1022–23 (3d Cir. 1988). In a trial saturated with gang and retaliation imagery, these measures conveyed to jurors that Healy was uniquely dangerous and eroded the presumption of innocence.

In violation of Rules 401, 403, and basic principles limiting gang-character evidence, the district court allowed the Government to portray Healy as a "ranking member" of the Tree Top PIRU Bloods even though Tree Top PIRU was not the

17

enterprise charged in Count One and the Government's proof of that status rested on hearsay-laden, non-competent assertions. Healy's alleged membership was at most marginally relevant to the New Jersey-based Healy DTE RICO conspiracy actually alleged, yet carried enormous risk that the jury would convict based on perceived gang dangerousness and propensity rather than admissible evidence of the charged conduct. By admitting this inflammatory label without a firm, non-hearsay foundation and without ensuring that its limited probative value outweighed its powerful prejudicial effect, the court abused its discretion under Rule 403 and permitted exactly the sort of propensity-driven verdict Mathis and related precedent warn against, requiring a new trial.

In violation of *Brady, Giglio*, and Rule 16(c), the Government withheld cooperating witness Matthew Robinson's historical cell-site and usage records—obtained in 2018 and specifically requested by the defense—until the eve of trial, burying them in an undifferentiated 3,000-page dump that made effective use impossible. AP 272.

The jury instructions on RICO conspiracy and VICAR likewise diluted essential elements—particularly the requirement that Healy knowingly agreed to the overall RICO scheme and act with the purpose of maintaining or increasing his position in the enterprise—contrary to settled precedent. *United States v. Antar*, 53

F.3d 568, 581 (3d Cir. 1995); *United States v. Urban*, 404 F.3d 754, 767–70 (3d Cir. 2005); *United States v. Thai*, 29 F.3d 785, 817–18 (2d Cir. 1994).

Under *Brown v. Ohio*, 432 U.S. 161 (1977), and the *Blockburger* "same-elements" test, and as confirmed by the Supreme Court's recent decision in *Barrett v. United States*, 607 U.S. 244 (2026), simultaneous convictions and sentences under 18 U.S.C. §§ 924(c) and 924(j) for the same firearm use and predicate offense violate the Double Jeopardy Clause, so one conviction in each § 924(c) and § 924(j) pair must be vacated and the case remanded for resentencing on the remaining counts. *Blockburger v. United States*, 284 U.S. 299 (1932)

The evidence was legally insufficient, especially on the homicide counts. Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a conviction fails if no rational juror could find each element proved beyond a reasonable doubt. Here, no physical or forensic evidence tied Healy to the killings. No neutral eyewitness identified him. And the Government's proof rested on uncorroborated, incentive-laden cooperator testimony, hearsay admitted under flawed legal theories, and inference-stacking in violation of *Caraballo-Rodriguez*, 726 F.3d at 430–32.

Finally, the time limitation on defense summation in a sprawling, life-sentence case, was arbitrary. That restriction impaired Healy's right to effective assistance at a critical stage and undermined the adversarial process, in tension with *Herring v.*

19

*New York*, 422 U.S. 853, 858–62 (1975), and this Court's authority on closing-argument constraints.

Taken separately, many of these errors would warrant relief. However, taken together, they reveal a trial directed away truth-seeking and toward conviction grounded in fear, anonymous procedures, and untested accusation.

## STANDARD OF REVIEW

The following standards of review govern this appeal.

Anonymous and sequestered jury with extreme security measures are reviewed for abuse of discretion. Any underlying Fifth or Sixth Amendment violations are reviewed *de novo*. *Scarfo*, 850 F.2d at 1022–23, *see also*, *Miller*, 527 F.3d at 60. Unpreserved claims are reviewed for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993). Constitutional error requires reversal unless harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).

Admission of hearsay, double hearsay, and Confrontation Clause questions are reviewed *de novo*. *United States v. Ammar*, 714 F.2d 238, 247 (3d Cir. 1983); *United States v. Lore*, 430 F.3d 190, 208 (3d Cir. 2005); *United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012). Forfeiture-by-wrongdoing findings are reviewed for clear error as to underlying facts and *de novo* as to constitutional sufficiency, with the burden on the Government. *United States v. Baskerville*, 448 F.3d 207, 213–14 (3d Cir. 2006) and *Giles v. California*, 554 U.S. 353, 367–68 (2008).

20

Sufficiency of the evidence is reviewed *de novo*. The Court must determine whether any rational juror could have found the essential elements beyond a reasonable doubt, and cannot sustain a conviction based on "speculation and conjecture" or inference-stacking. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), see also, *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–32 (3d Cir. 2013) (en banc).

Limitations on cross-examination that implicate the Confrontation Clause are reviewed *de novo*, with any subsidiary evidentiary rulings reviewed for abuse of discretion and resulting constitutional error assessed for harmlessness under the "harmless beyond a reasonable doubt" standard.

Evidentiary rulings admitting gang-character evidence under Rules 401 and 403 are reviewed for abuse of discretion. To the extent the ruling implicates constitutional due-process concerns by permitting conviction on propensity, the ultimate constitutional question is reviewed *de novo*, with non-constitutional error reviewed for harmlessness.

Whether the Government violated *Brady, Giglio*, and Rule 16(c) is a question of law reviewed *de novo,* while any factual findings underlying the district court's ruling are reviewed for clear error and the materiality and/or prejudice determination is reviewed *de novo*.

Jury instructions are reviewed for abuse of discretion. Whether an instruction accurately stated the law is reviewed *de novo. United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc). Errors affecting substantial rights are analyzed under Fed. R. Crim. P. 52 and, if constitutional, must be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).

Restrictions on defense summation are reviewed for abuse of discretion, with constitutional questions reviewed *de novo*. Improper limits require reversal unless harmless beyond a reasonable doubt. *Herring v. New York*, 422 U.S. 853, 858–62 (1975) and *United States v. Weatherly*, 525 F.3d 265, 271 (3d Cir. 2008).

The Court considers whether the cumulative effect of multiple errors "had a substantial influence on the outcome of the trial." *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992). Even individually harmless errors may require reversal when aggregated. *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014).

## ARGUMENT

### I.  THE ANONYMOUS AND SEQUESTERED JURY DEPRIVED HEALY OF A FAIR TRIAL

The decision to empanel an anonymous and partially sequestered jury, in combination with other extraordinary security measures, denied Healy his Fifth and Sixth Amendment rights to due process and a fair trial. Anonymous juries are "extraordinary" and permissible only in narrow circumstances, and only after

case-specific findings demonstrate a real need for such measures and confirm that less restrictive alternatives would be inadequate. *United States v. Scarfo*, 850 F.2d 1015, 1022–23 (3d Cir. 1988); *United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 2008). Here, the court relied principally on the seriousness of the charges and generalized assertions about gangs and witness intimidation, rather than on particularized evidence that this defendant, in this case, posed a concrete threat to juror safety or trial integrity.

### A.    The Measures Lacked Required Case-Specific Justification

Before imposing such measures, a district court must: (1) make detailed, case-specific findings explaining why anonymity is necessary; (2) explain why ordinary precautions are insufficient; and (3) adopt procedures to mitigate the prejudice anonymity creates. *Id*. The record here does not satisfy those requirements.

Rather than conducting a focused inquiry into Healy's individual conduct, history, or any specific attempt at obstruction, the court repeatedly invoked the racketeering and homicide charges, alleged gang affiliations, and co-defendants' plea allocutions as reasons to shield jurors' identities and modify their transport. In particular, the court pointed to the indictment's account of the Juan Martinez shooting and generalized references to "gang-related" violence, treating those

23

allegations as indicative of risk without any evidentiary hearing or finding that Healy himself had attempted to interfere with jurors or witnesses.

### B. The Procedures Communicated Presumed Dangerousness and Were Not Neutralized

The manner in which anonymity and security were implemented also reinforced an impermissible message - that Healy was too dangerous to be tried under ordinary procedures. *Scarfo* warned that anonymity "carries with it the risk that the jury will infer that the defendant is a dangerous person from whom they must be protected," and held that courts must take affirmative steps—typically, a neutral explanation—to dispel that inference. *Id*. Likewise it requires that the trial court "adequately explain the reasons for anonymity to the jury to avoid prejudicing the defendant." *Miller* 527 F.3d at 60.

The court and counsel explicitly debated whether to give an "anonymous jury" instruction. The Government urged a direct explanation. The defense requested a neutral instruction that "we use numbers" for administrative reasons. Tr. 469. The court ultimately chose to say nothing because it feared any explanation might "stoke fear." Tr. 470.

During individual sidebar *voir dire*, Prospective Juror 020 described "the gang thing" as "a little bit…a little scary to be part of a jury," noted his work in neighborhoods connected to the allegations, and volunteered that he would feel more

24

comfortable if "it was an anonymous thing." AP 512-515. The court reassured him about general courthouse security but did not explain that juror numbers and security measures were not a comment on Healy's dangerousness. AP 512-515. Other jurors voiced anxiety about guns and violence and uncertainty about setting those emotions aside.[2] AP 475. This record confirms that juror fear was real and that, in the absence of a neutral explanation, anonymity and security naturally fed into that fear.

## C. Lack of Curative Instruction Rendered the Error Not Harmless

The overall trial framing made the prejudice from anonymity and security impossible to cabin. In addressing the jury, the court described the case as one in which "the Government alleges that Michael Healy operated a drug-trafficking enterprise" involving guns, gangs, and violent acts, and emphasized the seriousness of the charges and the importance of jurors fulfilling their duty despite inconvenience. AP 376. Jurors thus came into the case primed to view Healy as a dangerous figure at the center of a violent enterprise and were assigned numbers rather than names. Against that backdrop, and in the absence of any instruction separating anonymity and security from defendant-specific danger, the presumption of innocence was overshadowed by fear and perceived risk.

---

[2] The defense warned about this in its pretrial motions asking the district court to limit the admission of inflammatory evidence regarding guns and violence.

25

Under *Chapman v. California*, 386 U.S. 18, 24 (1967), the Government bears the burden of showing that constitutional error is harmless beyond a reasonable doubt. The anonymous-jury and heavy security regime here was not a discrete, easily compartmentalized misstep. It shaped the jury's perception of the defendant from the outset and persisted throughout a trial that turned on the credibility of heavily incentivized cooperators rather than on physical or forensic proof. In such a case, there is no reliable way to conclude that jurors' fear, and their understanding that they were being protected from this particular defendant, did not tip the scales on contested issues of credibility and intent.

## II. IT WAS AN ABUSE OF DISCRETION TO ALLOW THE GOVERNMENT TO PRESENT HIGHLY INFLAMMATORY AND PREJUDICIAL EVIDENCE THAT HEALY WAS A "RANKING MEMBER" OF THE TREE TOP PIRU SUBSET OF THE BLOODS

This highly inflammatory gang-character evidence was (1) irrelevant or only marginally relevant to the RICO enterprise actually charged in Count One, (2) classic propensity proof whose unfair prejudice substantially outweighed any probative value under Rule 403, and (3) unsupported by competent, non-hearsay proof. *United States v. Mathis*, 264 F.3d 321, 326–27 (3d Cir. 2001).

### A. Tree Top PIRU Was Not the Charged Enterprise

The Tree Top PIRU was not the enterprise alleged in Count One. The Second Superseding Indictment charged a racketeering conspiracy involving the Healy

DTE, a New Jersey-based narcotics and racketeering organization allegedly formed "after [Healy's] release from prison," and separately described Tree Top PIRU as a preexisting Bloods gang "originally formed in Compton, California" that spread through the Maryland prison system of which Healy supposedly became a member while incarcerated between 2003 and 2012. AP 113.

This Court has warned that gang-affiliation evidence is admissible only when it is "solidly tied to some legitimate purpose other than a showing of a propensity to criminal conduct," such as motive or identity, and not to invite guilt-by-association. *United States v. Carter*, 410 F. App'x 549, 553 (3d Cir. 2011).

### B.    The Government's Proof Did Not Match Its Tree Top Theory

The trial record underscores how thin the Tree Top showing was. No Tree Top PIRU member testified that Healy was a member or leader of that set, or that any PIRU connection was in fact used to source drugs or personnel for the Healy DTE. None of that proof established the core factual claim embedded in the indictment— that Healy's status in Tree Top PIRU was actually leveraged to obtain suppliers or recruit members for the New Jersey-based Healy DTE.

Cooperating witness, Darnell Morales's testimony highlights the gap. Morales, a Mob Piru member from East Orange, described Healy as "a somebody" and "a OG," but admitted he "wasn't the real OG" and had no concrete knowledge of Tree Top PIRU's internal membership records. Morales referenced a "Piru book"

in which new members allegedly sign their names or initials, yet no such record containing Healy's name or initials was ever produced. AP 1494. Under Rules 602 and 701, this sort of loose reputation testimony—untethered to personal knowledge of Tree Top PIRU's structure and records—could not supply the evidentiary foundation that the Government's "ranking member" theory required. Fed. R. Evid. 602, 701, *see also*, *United States v. Mathis*, 264 F.3d at 326–27 (upholding admission of other-acts testimony where the Government actually offered detailed, first-hand co-conspirator evidence and the court carefully cabined its use). Here, by contrast, the Government's proof did not match the indictment rhetoric.

Nor can the Government's position be salvaged by invoking Rule 801(d)(2)(E). Tree Top PIRU was not the enterprise alleged in Count One, and statements by Healy DTE members or East Orange gang members about Tree Top PIRU were not shown to have been made "in furtherance of" the New Jersey conspiracy. This Court's precedent forecloses using the co-conspirator rule to bootstrap statements about separate, uncharged enterprises into evidence simply to brand a defendant a gang leader. *United States v. Ammar*, 714 F.2d 238, 247–49 (3d Cir. 1983). The Government must present independent, non-hearsay evidence of the conspiracy and the defendant's membership. Hearsay cannot be used to bootstrap its own admissibility. And, the Government's trial proof fell substantially short of its Tree Top theory.

28

## C.    The Court's Ruling Forced a Prejudicial Stipulation

Before trial, the defense moved *in limine* to exclude any Tree Top PIRU evidence on relevance and prejudice grounds, emphasizing that it would invite the jury to convict based on gang character rather than admissible proof of the charged enterprise. The court denied that motion and indicated it would permit the Government to elicit Tree Top PIRU evidence over objection. At that point, the defense confronted a tactical dilemma shaped by the court's ruling. If the defense continued to resist, the Government could parade agents and cooperators through the stand to describe contested "ranking" claims in a vivid, narrative format.

Against that backdrop, the defense agreed to a narrow stipulation—Gov't Ex. 800—that "prior to January 2013, the defendant, Michael Healy, became a ranking member of the Tree Top Piru subset of the Bloods street gang while residing in Maryland." AP 632. On appeal, the sequence matters. The stipulation was not a free admission that the Tree Top theory was sound or relevant, but a damage-control response to an adverse evidentiary ruling that made some form of PIRU "ranking member" evidence inevitable. That dynamic reinforces, rather than undercuts, the conclusion that the underlying ruling was an abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 183–85 (1997), (district court must consider less prejudicial alternatives once defendant offers to stipulate); *United States v. Davis*, 726 F.3d 434, 442–44 (3d Cir. 2013) (reversing where district court admitted prior-drug-possession

29

evidence despite availability of less prejudicial ways to prove knowledge, emphasizing "ever-present danger" of propensity reasoning in Rule 404(b) context). Once the court permitted the Government to go into Tree Top PIRU over Rule 401 and 403 objections, it effectively compelled the defense to choose the lesser of two prejudicial evils, ensuring that the jury would hear that Healy was a "ranking" Bloods member even though that label was only tenuously related to the elements actually at issue.

### D. The Tree Top Evidence Was Propensity-Driven and Unfairly Prejudicial

The minimal probative value of the Tree Top evidence was overwhelmed by its prejudicial impact. The Government could—and did—attempt to prove Healy's leadership of the Healy DTE through cooperator testimony, communications, and drug-trafficking evidence. It did not need to add that he had once been a "ranking" Tree Top PIRU member to show he could find suppliers or organize associates.

Under *Old Chief* and Rule 403, the district court was required to consider whether less inflammatory evidence was available to prove the same point. Here, the answer is plainly yes. *See* Fed Rule of Evid. 403, *see also*, *Mathis*, 264 F.3d at 326–27 (affirming where court expressly weighed prejudice against substantial probative value and used limiting instruction); *United States v. Carter*, 410 F. App'x 629, 632–33 (3d Cir. 2011) (recognizing that Rule 403 "creates a presumption of

admissibility" but requires exclusion where gang-affiliation evidence's unfair prejudice substantially outweighs its probative value).

By contrast, the risk of unfair prejudice was acute. The case was tried before an anonymous, partially sequestered jury in a courtroom with heightened security, and the overarching narrative was one of gangs, guns, and violence. In that context, branding Healy a "ranking member" of a notorious Bloods subset inevitably encouraged the jury to see him as the kind of person who would order retaliatory murders and run a violent enterprise. The Government's opening and summation confirmed this function. The Government leaned on Healy's PIRU status and alleged "no-snitch" ideology to explain away cooperator fears and to supply motive where ordinary evidence was thin. AP 3055. That is precisely the propensity reasoning Rule 404(b)(1) and Rule 403 exist to prevent. *Williams v. U.S.*, 458 F.3d at 317–19 (Rule 404(b)'s bar on propensity applies regardless of who offers the evidence, and courts must rigorously enforce Rule 403 where there is a danger the jury will infer "criminal disposition"), *see also*, *Davis v. U.S.*, 726 F.3d at 442–44 (reversing where prior-act drug evidence invited inference that defendant "was the kind of person who deals drugs").

Trial courts must exclude otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, especially where the evidence is likely to inflame jurors or prompt decision on an improper basis.

31

*Mathis*, 264 F.3d at 326–27, *see also, Carter*, 410 F. App'x at 632–33. In this case the Tree Top PIRU "ranking member" label did exactly that. In a thin, credibility-driven RICO and VICAR trial already saturated with gang and retaliation imagery, admitting that label was an abuse of discretion that undermines confidence in the verdict on Count One and the related violent-crime counts.

## III.    THE COURT VIOLATED THE CONFRONTATION CLAUSE BY ADMITTING TESTIMONIAL HEARSAY

The Confrontation Clause violations in this case cannot be separated from the broader trial. The admission of testimonial hearsay at trial—particularly via forfeiture-by-wrongdoing and the co-conspirator exception—supplied elements the Government otherwise lacked and insulated its case from adversarial testing. Under *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), testimonial hearsay is inadmissible unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. Statements elicited in formal law-enforcement interviews plainly qualify as testimonial. *Id*. at 68 *see also United States v. Hinton*, 423 F.3d 355, 360–61 (3d Cir. 2005). Here, the Government repeatedly proved cooperation, threats, motives, and knowledge not through the declarants themselves, but through cooperators and agents recounting what others allegedly "said," "reported," or "told" them during investigations, and it offered those statements for their truth on contested elements of intent and conspiracy. Because Healy never had

a chance to confront those declarants, admission of their testimonial statements violated the Confrontation Clause unless a valid exception—properly proven—applied. It did not.

### A.   Testimonial Hearsay Through Officer Weeks and the Nunez Statement

The clearest violation arises from Officer Weeks's testimony relaying statements allegedly made by José Nunez to Homeland Security Investigations (HSI). Nunez was a California-based courier who physically drove multi-kilogram fentanyl and cocaine loads cross-country who did not deal with Healy directly. AP 823. Before Officer Weeks testified, the only Jencks material produced to the defense reflected Nunez describing deliveries to Harrisburg, Pennsylvania—information that, while inculpating Nunez, had no nexus to Healy or the charged New Jersey enterprise. AP 2579. On direct, the prosecutor asked Officer Weeks where Nunez "really had been and where he was going," and Officer Weeks answered that Nunez told HSI he traveled to Newark, delivered fentanyl, and was returning with payment. AP 2576. This was testimonial hearsay, delivered through a law-enforcement officer, based on an undisclosed report, and it directly corroborated cooperator testimony about New Jersey fentanyl trafficking—corroboration the defense had no reason to anticipate from the *Jencks* production it actually received. AP 2576. Only after Officer Weeks testified did the Government produce an HSI report—received by

prosecutors shortly before or during trial—memorializing a materially different Nunez statement, that he transported fentanyl and cocaine to Newark, New Jersey.[3] AP 2580, 2582-2585.

### 1.    Nunez's Statements Were Inadmissible Under Rule 801(d)(2)(E) and This court Precedent

The Government cannot launder testimonial interview statements to law enforcement through the co-conspirator exception. Under Rule 801(d)(2)(E), a statement is admissible only if made "during and in furtherance of" a conspiracy. Fed. R. Evid. 801(d)(2)(E). This Court has held that statements to non-members, or narratives of past events, are generally not "in furtherance" and therefore fall outside the exception. *United States v. Provenzano*, 620 F.2d 985, 999–1000 (3d Cir. 1980) *and United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983). Nunez's description of past deliveries to HSI was a classic historical narrative given in a formal interview with investigators. It did not advance any conspiracy, it impeded it. It therefore could not be admitted under Rule 801(d)(2)(E).

---

[3] The defense moved for a mistrial because Officer Weeks testified, for the first time at trial, about a Nunez report and related documents that had never been turned over to the defense. errors and precludes any finding that the Confrontation Clause violations were harmless beyond a reasonable doubt.

## 2.     The Admission Was a Direct *Crawford* Violation

Statements made in structured law-enforcement questioning are classic "testimonial" under *Crawford,* 541 U.S. at 68 and *Hinton,* 423 F.3d at 360–61. Nunez did not testify at trial; Healy never had a prior opportunity to cross-examine him. Yet the Government used Officer Weeks to deliver Nunez's recorded accusation that fentanyl and cocaine were delivered to Newark, providing the only law-enforcement corroboration for a contested part of the New Jersey conspiracy narrative. That is precisely what *Crawford* forbids.

## 3.     The Testimony Was Also Prejudicial Double Hearsay

Officer Weeks's account contained at least two hearsay layers: (1) Nunez's statement to HSI and (2) HSI's communication to Officer Weeks, memorialized in a report. No exception was established for either layer, contravening Rule 805. The prejudice was acute. The Newark version of Nunez's also story directly bolstered the credibility of cooperator Brian Miranda on New Jersey fentanyl shipments and turned a contested credibility question into what appeared to be an independent "law-enforcement fact." AP 755-756. Viewed with the forfeiture and co-conspirator errors elsewhere in the record, the Officer Weeks and Jose Nunez incident exemplifies how testimonial hearsay was used to supply essential elements in a case lacking physical or forensic proof and how late, incomplete *Jencks* production deprived the defense of any meaningful chance to respond.

35

**B.    The Court Allowed Additional Agent "Narrative" Hearsay Through Special Agent Frederick in Violation of *Ammar* and Confrontation Principles**

Special Agent Jason Frederick was the lead FBI case agent on the Healy investigation and testified at trial as the Government's primary law-enforcement witness, walking the jury through the supposed structure of Healy's "enterprise," the Bloods subsets at issue, and the meaning of various phone, financial, and physical-evidence exhibits. Although he was not qualified or presented as a gang expert, the Government used him to "summarize" the investigation and then offer bottom-line conclusions about Healy's gang rank, subset affiliation, and alleged co-conspirators based largely on what others told him rather than on his own personal observations.

That is the kind of bootstrapping *Ammar* forbids. *Ammar*, 714 F.2d 238, 247–49 (3d Cir. 1983). The Government may not rely on hearsay-based "our investigation showed" conclusions to establish the existence and scope of a conspiracy and the defendant's membership, and then use those conclusions as the foundation for admitting additional statements under Federal Rule of Evidence 801(d)(2)(E). *Ammar*, 714 F.2d 238, 247–49 (3d Cir. 1983). In this case, the Government used Agent Frederick's narrative to label Healy a "ranking" Blood and to link him to particular Bloods subsets (Mob Piru, Brick City Brims, Tree Top Piru) for both Rule 801(d)(2)(E) and VICAR/RICO-enterprise purposes. Despite the fact that Agent

36

Frederick repeatedly relied on jail calls, interviews, and other out-of-court statements that were never subject to cross-examination. That testimony was improper in two respects: (1) it was inadmissible lay opinion under Federal Rule of Evidence 701 because it was based on investigative synthesis rather than first-hand perception, and (2) it fit the *Ammar* pattern of using narrative hearsay to prove the very conspiracy and enterprise predicates that were then invoked to admit more hearsay. *Id.*

The treatment of the George Oswald phone and toll records illustrates the problem. After Oswald's death, Agent Frederick obtained Oswald's phone from his lawyer and photographed the contacts, which listed eight entries as "Mr. B, New Jersey," some with date notations and one labeled "Dougie, May 2018, Mr. B, New Jersey." AP*. AP 2642. Those screenshots were admitted (Gov't Ex. 239-1–239-8); AP 2642, and Agent Frederick then sponsored a summary chart (Gov't Ex. 700) purporting to show "common calls between those numbers" and various individuals—including Healy's girlfriend and co-conspirator Leevander Wade—based on toll records for the "Mr. B" phones. AP 2810.  He further testified that one "Mr. B, New Jersey" number was the same "Mr. B" number heard on a recorded jail call that the Government attributed to Healy, again framed as what "the investigation showed" rather than proven through a reliable witness. AP 1734-1735. This was not a neutral Rule 1006 summary of admitted records. It was an interpretive narrative

37

that used hearsay-laden phone labels and law-enforcement inferences to prove the very relationships the Government then invoked to treat later communications as co-conspirator statements under Rule 801(d)(2)(E), in direct tension with *Ammar*, 714 F.2d at 247–49.

This Court has cautioned that the Government may not circumvent the hearsay rules and *Crawford* by presenting testimonial statements through "course-of-investigation" narratives by law-enforcement witnesses. *United States v. Berrios*, 676 F.3d 118, 127–29 (3d Cir. 2012). *Ammar* likewise holds that hearsay cannot be used to establish the predicate facts—the existence of the conspiracy, the defendant's membership, and the in-furtherance requirement—that must be proven before Rule 801(d)(2)(E) applies. Here, Agent Frederick's narrative testimony did exactly what those cases forbid. *Ammar*, 714 F.2d at 247–49.

Agent Frederick's "based on your investigation" answers about gang membership, hierarchy, travel, and communications underscore the point. AP.640, 641, 2571, 2578, 2583 and 1477. He testified that his investigation showed particular individuals "were members" of the Brick City Brims and that agents. AP 2642. He also asserted that a "T" hat in Capital T Consulting photographs was "a symbol of the Tree Top Piru gang," and the Government then treated that detail in summation as proof that Capital T was a "Tree Top" money-laundering vehicle. These were not neutral descriptions of records. AP 3047. They were narrative conclusions that

38

aggregated hearsay and other officers' work and told the jury what inferences to draw.

This Court has recognized that agents may summarize voluminous phone records, but has cautioned against allowing agents to interpret those records by attributing identities, relationships, or meanings that are not themselves established by admissible evidence. *Berrios*, 676 F.3d at 126–29. That is precisely what Agent Frederick did in this case. That limitation aligns with *Ammar'*s ban on using "investigation-showed" narratives to prove the conspiracy and relationship predicates for Rule 801(d)(2)(E). By using the Oswald phone contacts and toll charts to identify eight "Mr. B, New Jersey" numbers as Healy's and to infer specific associations within a "criminal organization," Frederick crossed the line from permissible summary into impermissible interpretive opinion and narrative hearsay performing central evidentiary functions.

The Government bears the burden of proving that the errors were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967), *see also*, *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). In a case where the Government's proof turned on testimonial narratives and the perceived credibility of cooperators and agents—and where agent-relayed hearsay, including the Oswald "Mr. B" phone evidence, supplied both the connective tissue of the alleged enterprise and key proof of Healy's rank, knowledge, and motive—that burden cannot be met.

39

## IV.  THE COURT ALSO VIOLATED THE CONFRONTATION CLAUSE BY MISAPPLICATION OF FORFEITURE BY WRONGDOING AND BOOTSTRAPPING UNDER RULE 801(D)(2)(E)

The district court's forfeiture-by-wrongdoing ruling was erroneous and opened the door to unreliable hearsay throughout the trial. By finding forfeiture on Government proffers rather than independent, admissible evidence that Healy knew Statiroudis was cooperating and killed him to prevent his testimony, the court bypassed *Giles's* specific-intent requirement and treated untested allegations as a substitute for proof. *Giles v. California*, 554 U.S. 353, 361–62, 366–67 (2008).

*Giles v. California*, 554 U.S. 353, 361–62, 366–67 (2008), however, holds that forfeiture by wrongdoing is a "narrow exception" that applies only where the prosecution proves, with evidence independent of the very statements it seeks to admit, that the defendant acted with the specific purpose of preventing a particular witness from testifying. A generalized readiness to use violence, or an alleged pattern of violence against "cooperators" derived from untested materials, is not enough. *Id*. at 377. Here, when the court made its forfeiture finding as to Statiroudis, there was no trial-tested, admissible evidence that Healy knew Teddy was cooperating, knew he was speaking with the DEA, or directed his killing to silence his testimony.

The district court allowed the Government to introduce wide-ranging testimonial hearsay from and about Statiroudis through cooperators and agents and to reuse those same statements as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). That sequence—hearsay and proffer to establish forfeiture, forfeiture to admit more testimonial hearsay, and those statements to prove the conspiracy and membership predicates for Rule 801(d)(2)(E)—is classic circular bootstrapping. *Giles* 554 U.S. at 366–67 squarely forbids using the very statements whose admissibility depends on forfeiture to prove the predicate intent to procure a witness's absence. And under *United States v. Ammar,* 714 F.2d 238, 247–49 (3d Cir. 1983) and *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), co-conspirator statements cannot bootstrap themselves into admissibility, the Government must present independent evidence of a conspiracy and the defendant's membership, and "the statements themselves are not alone sufficient" to establish those foundational facts. Here, the existence of an alleged "witness-murder" conspiracy and Healy's role in it were inferred almost entirely from the very hearsay being admitted—much of it retrospective narrative and rumor, not statements made "in furtherance" of any conspiracy.

Rule 804(b)(6) does not authorize this approach. That provision makes a statement admissible against "a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so

41

intending that result." Fed. R. Evid. 804(b)(6). This Court has summarized the Government's burden as showing "(1) that the defendant engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability." *United States v. Baskerville*, 448 F. App'x 243, 250 n.5 (3d Cir. 2011) (*quoting United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002)).

Here, the district court did not hold an evidentiary hearing, did not hear live testimony on whether Healy knew of Statiroudis's cooperation, and did not identify independent and reliable proof that Healy ordered Statiroudis's killing to prevent his testimony. Instead, it relied on proffers to draw sweeping conclusions about Healy's "demonstrated willingness to use murder to disrupt the truth-seeking process" and an asserted pattern of targeting cooperators. It then used those conclusions to admit testimonial hearsay from and about Statiroudis and to bootstrap those same statements into the Rule 801(d)(2)(E) framework.

The result was that an erroneously broad forfeiture finding allowed unreliable hearsay to permeate the trial. Hearsay was used to prove forfeiture. Forfeiture was then invoked to admit additional testimonial hearsay from and about the key unavailable declarant-Statiroudis. Those statements were then used to establish the very conspiracy and intent elements the Government otherwise could not prove. That is not permissible evidentiary reasoning under *Giles, Ammar*, or Rule

42

804(b)(6). It is the kind of circular bootstrapping the Confrontation Clause is designed to prevent, and it requires reversal.

The Government may argue that even if that forfeiture ruling was flawed, Statiroudis's statements were nonetheless admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). But forfeiture and the co-conspirator provision are analytically distinct rules that impose different predicates and serve different purposes. Rule 804(b)(6) permits otherwise inadmissible hearsay if the defendant caused the witness's unavailability with intent to prevent testimony, while Rule 801(d)(2)(E) separately requires that any such declaration be made "by the party's coconspirator during and in furtherance of the conspiracy." The Government cannot cure an inadequate or erroneous 804(b)(6) foundation by retroactively re-labeling these same statements as co-conspirator hearsay when the Rule 801(d)(2)(E) elements were neither found nor satisfied.

That mismatch is especially stark given the Government's own theory of forfeiture. To establish Rule 804(b)(6), the Government argued—and the court accepted—that Statiroudis was a DEA informant and prospective federal witness whom Healy caused to be killed to prevent his cooperation and testimony. A posture that placed Statiroudis in the role of a government agent rather than a co-conspirator. Federal conspiracy law has long recognized that there is no conspiracy with a government agent or informant because the agent does not share the unlawful

objective, and courts applying Rule 801(d)(2)(E) have imported that principle by requiring independent proof that the declarant was a genuine co-conspirator, not acting for the Government. By proving that Statiroudis was working with DEA to support its forfeiture theory, the Government simultaneously disqualified him as a "co-conspirator" whose statements can be treated as Healy's vicarious admissions under 801(d)(2)(E), and Statiroudis's cooperation-driven statements to law enforcement—identifying participants, describing past acts, and supplying investigative detail—were not made "in furtherance" of any criminal objective, but to advance his own cooperation and the Government's case.

### A.    Hearsay Through Gregory Drozjock Highlights the Structural Error

The testimony of Gregory Drozjock[4] illustrates the structural flaw in the case. Before he testified, the Government confirmed—and the defense noted on the record—that Drozjock was not a co-conspirator. Nevertheless, the court allowed him to recount accusations surrounding Statiroudis's alleged cooperation. When asked whether others accused Statiroudis of cooperating, Drozjock answered that he had heard it "50 times," and elaborated that Statiroudis would be on the phone declaring

---

[4] Gregory Drozjock was a 70-year-old retired health-club manager and former accountant who became a close friend of Statiroudis, stayed at his Ampere Parkway house weekly. AP*Tr. 575-576

"I'm no rat, I'm no rat," then tell people in the house he could not believe others thought he was cooperating. AP 1021.

Because Drozjock was not a co-conspirator, he could not properly be treated as one. His account of what others said about Statiroudis could not qualify under Rule 801(d)(2)(E). *United States v. Ammar*, 714 F.2d 238, 247–49 (3d Cir. 1983). These statements also violated the forfeiture by wrong doing principle. They were admitted only because the court had already accepted—based on proffers and allocutions—that Healy used murder to silence witnesses. But under *Giles*, forfeiture must rest on independent proof of intent.  Statements from a non-conspirator about what an unavailable declarant supposedly said do not satisfy that requirement. *Giles v. California*, 554 U.S. 353, 361–62 (2008). Using hearsay like Drozjock's testimony both to justify forfeiture and to flesh out the narrative of retaliation exemplifies "using hearsay to justify more hearsay," contrary to *Giles* and *Crawford. Giles*, at 366–67 and *Crawford*, 541 U.S. 36, 53–54 (2004).

### 1.These Confrontation Violations Were Not Harmless

Under *Chapman*, Confrontation Clause violations require reversal unless the Government can prove they were harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24. That showing cannot be made here. The improperly admitted testimonial hearsay supplied the only law-enforcement corroboration that Nunez's

45

fentanyl trafficking reached Newark rather than Harrisburg. It also provided the principal foundation for Healy's supposed knowledge that Statiroudis was cooperating. Lastly, it served as the backbone of the Government's motive theory— that Healy used murder to silence cooperators and maintain his position in the enterprise.

In a trial with no direct physical or forensic evidence linking Healy to the killings and no neutral eyewitnesses identifying him as a shooter, the verdict turned on the credibility of cooperators and the persuasive power of the Government's hearsay-laden case. By allowing testimonial hearsay to perform the work of proof through forfeiture bootstrapping, and through non-conspirator witnesses like Drozjock, the district court deprived Healy of the confrontation to which he was constitutionally entitled. Those errors were not harmless. In fact, they were outcome-shaping, and they require reversal of the affected counts.

## V.    THE RESTRICTIONS ON IMPEACHING MORALES WITH HIS GRAND JURY TESTIMONY VIOLATED THE CONFRONTATION CLAUSE AND WERE NOT HARMLESS

The Confrontation Clause guarantees a criminal defendant "an opportunity for effective cross-examination," not merely "to be allowed to ask a few questions." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Although trial courts retain discretion to control the mode and order of interrogation, that discretion may not be

46

exercised to cut off a "proper and important line of cross-examination" bearing on the credibility of a key witness. *Id*. at 679–80, *see also*, *Davis v. Alaska*, 415 U.S. 308, 318 (1974). Here, the district court restricted Healy's attempts to impeach government cooperator Darnell Morales with his prior grand jury testimony on non-collateral, central issues like the nature of the Orange Park meeting (where Government alleged that Healy ordered the killing of Statiroudis, when and how he learned that they had killed "the wrong guy," and the alleged facts of the Statiroudis shooting. Taken together, these rulings substantially impaired Healy's ability to expose critical inconsistencies in the only witness who tied him to both the Statiroudis and Martinez homicides, in violation of the Sixth Amendment.

### A.    Legal standard

Under the Sixth Amendment, a defendant must be afforded "a meaningful opportunity to cross-examine adverse witnesses," particularly on bias and credibility. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (*per curiam*), *see also*, *Van Arsdall*, 475 U.S. at 679. Although a judge may impose reasonable limits based on concerns about harassment, prejudice, confusion of the issues, or repetitive questioning, the court may not so limit cross-examination that it prevents the defendant from placing the witness "in his proper setting and putting the weight of

his testimony and his credibility to a test." *Alford v. United States*, 282 U.S. 687, 692 (1931); *see also Davis*, 415 U.S. at 316–18.

Separately, the rules of evidence expressly permit impeachment of a witness with prior inconsistent statements on non-collateral matters. *See, e.g.*, Fed. R. Evid. 607, 613. When a witness gives materially different accounts under oath, the jury is entitled to hear that discrepancy so it can "make a discriminating appraisal of the witness' credibility." *United States v. Abel*, 469 U.S. 45, 52 (1984) (quotation marks omitted), *see also, Van Arsdall*, 475 U.S. at 679. Restrictions that prevent effective use of those prior statements on core issues implicate both evidentiary error and the Confrontation Clause. *United States v. Chandler*, 326 F.3d 210, 219–20 (3d Cir. 2003).

### B.    Morales Was The Linchpin Witness; His Credibility Was Central

The Government's theory that Healy orchestrated the shooting of Statiroudis rested almost entirely on Morales. Morales alone supplied the narrative that Healy was a dual-set supplier to both Mob Piru and the Brick City Brims. Moreover, that Healy convened a joint Orange Park meeting of rival sets on February 3, 2018, after which Tyree Thomas (high ranking Mob Piru) allegedly selected Morales and others to "to kill a "rat (Statiroudis)" Healy wanted removed. AP 1434. There was no physical evidence tying Healy to either homicide, and no other witness purported to

48

have personal knowledge that Healy ordered these acts. Morales's credibility was therefore "central, not peripheral" to the verdict. *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (*per curiam*). Any substantial restriction on the defense's ability to confront his shifting story cannot be dismissed as harmless.

### C.  The Court Curtailed Non-Collateral Impeachment With Morales's Grand Jury Testimony

#### 1.  Orange Park Meeting

At trial, Morales described the Orange Park gathering as having "20-plus" Mob Piru members present. On cross-examination, when asked whether he had testified in the grand jury that there were "40 or 50 Mob Piru" at that meeting and that the meeting was set for 1:00 p.m. and was mandatory on pain of discipline, Morales answered, "I don't recall." AP *Tr. 1035, 1039.

Defense counsel attempted to confront Morales with his prior sworn testimony by reading the relevant grand jury question and answer. The court sustained the Government's objection, stating there had been "no failure of recollection" and forbidding counsel from exposing the inconsistent grand jury testimony to the jury. AP 1469. Although the court eventually allowed counsel to show the page "just to the witness" and elicited a grudging concession ("I see it there…It gotta be what I said"), the jury never heard the precise language of Morales's grand jury testimony about a mandatory, large-scale summit convened at a fixed hour. AP 1479.

49

This was not collateral. The nature and scope of the Orange Park meeting went directly to whether the Government had proven a deliberate, multi-set conspiracy supposedly precipitated by Healy. It is the meeting where Healy allegedly ordered the Blood sets to travel to kill Statiroudis. Morales's grand jury portrayal of a 1 p.m. mandatory meeting with "40 or 50 Mob Piru" undercuts his attempt to minimize the meeting as "20-plus" and more informal. By barring counsel from using the grand jury transcript in the ordinary way after a professed failure of recollection the court blunted the force of this impeachment on a central fact. *United States v. Green*, 617 F.3d 233, 244–45 (3d Cir. 2010) (reversing where limits on use of prior statements undermined core impeachment).

### 2.   Timing of Morales's knowledge that "the wrong guy was shot"

On direct, Morales testified that only later he learned that the Blood sets ordered to kill Statiroudis had shot "the wrong person," when he asked Hell Boy about payment and was told "it was the wrong person." That portrayal allowed Morales to appear less informed and less culpable in real time.

In his June 12, 2018, FBI debriefing and November 2018 grand jury testimony, however, Morales placed the "wrong guy" realization in the car on the ride back from the shooting. AP 292. In the briefing, he said that during the drive "back to Irvington and East Orange," T-Rose received multiple calls, including one where "HB called T-Rose and said the wrong guy was shot," after which "T-Rose

50

says 'fuck, that was the wrong nigga.'" AP 292. That contemporaneous awareness goes directly to Morales's knowledge, intent, and reliability in describing the event.

When defense counsel attempted to impeach Morales with this prior sworn account, the court again treated the effort as procedurally defective and limited the use of the transcript, preventing the jury from hearing the clearest articulation of the inconsistency. This was not cross on marginal details. It bore on whether Morales was forthright about what he knew, and when, regarding the central homicide in the case. *United States v. Mussare*, 405 F.3d 161, 169–70 (3d Cir. 2005) (error to unduly limit impeachment on central event chronology).

### 3. Use of "C-Dot" as an identification for Mr. Healy

The FBI's June 12, 2018 FD-1023 reflects Morales identifying "Michael" as "C-dot," a white male, a high-ranking Blood "major narcotics supplier" to Brims and Pirus alike. AP 292. Morales's grand jury testimony dovetails with that language. On cross-examination at trial, however, Morales denied ever referring to Healy as "C-Dot" and professed a lack of recollection regarding his prior use of that label. AP*.

Once again, when defense counsel attempted to use the grand jury transcript to confront this change, the court prevented direct questioning regarding the grand jury testimony and restricted the manner in which counsel could use the prior testimony. The "C-Dot" usage was significant because it showed Morales's

51

identification language tracking law enforcement's evolving theory rather than originating from his own independent observations. Limiting impeachment on that point deprived the jury of a full view of how Morales's terminology had shifted to fit the government's case. State v. *Silva*, 131 N.J. at 444–45, 621 A.2d at 19–20 (1993).

### 4.   Statiroudis Shooting Alleged Facts And Shooter Positions

Morales's own accounts of the Statiroudis shooting cannot be reconciled on the basic question of where the gunfire came from. In the grand jury, he placed Thomas Zimmerman "Lil Baby" firing from the driver's side of the front car and described the shots as coming from his left, i.e., across the street toward the driver's side of the victim's vehicle. AP 340. At trial, by contrast, he shifted to say Zimmerman was shooting out of the sunroof toward the right passenger side, and that a second shooter's muzzle flash appeared somewhere near the driver's side door but he could not tell whether it was front or back. AP 1500-1501. He further altered the sequence of fire, first placing the BCB car's shots and then Meer's (Mob Piru member) shot from the Impala following only "two or three seconds" later, yet Morales told the grand jury that shots were coming from "the other side of the street," inconsistent with his later description of the line of fire relative to his own car. AP 317. These mutually inconsistent versions about which side of the car was used, which side of the street the shots came from, and how the shooters were

positioned fatally undercut Morales's trial testimony regarding how the Statiroudis shooting actually occurred.

At trial, defense counsel sought to impeach Morales with specific grand jury passages addressing where the shots came from and who fired them. AP 317-318. The district court concluded that "the impeachment right now is not perfected," declining to allow counsel to use the specific excerpt he had prepared. AP 1506. Although the court suggested counsel could "develop the record" further, it ended up shielding Morales's trial testimony from the most important contradictions in what he'd said under oath before the grand jury. AP 1506.

Given that there were no other eyewitnesses tying the Statiroudis shooting to Healy's alleged involvement, these details were not collateral. They bore on the reliability of Morales's entire testimony about the planning, execution, and aftermath of the murders that underlay the racketeering and violent-crime counts. *Chandler,* 326 F.3d at 219–20.

## VI.  THESE LIMITATIONS MATERIALLY UNDERMINED HEALY'S RIGHT TO CONFRONT THE KEY WITNESS AGAINST HIM, AND THE ERROR WAS NOT HARMLESS

The Government will likely argue that the Confrontation Clause was satisfied because defense counsel was permitted to cross-examine Morales at length, and because some impeachment with prior statements ultimately reached the jury.

53

However, the Supreme Court has made clear that the question is not whether some cross-examination occurred. It is whether the defendant was precluded from engaging in a "proper and important line of cross-examination" that would have allowed the jury to assess the witness's credibility. *Van Arsdall*, 475 U.S. at 679–80.

Rather, here, the "line" at issue was not Morales's general character for truthfulness; it was whether his specific accusations against Healy—about motive, authorship, and knowledge of two murders—were rooted in consistent, first-hand recollection or in shifting, hearsay testimony that evolved to match the Government's theory. The prior grand jury testimony on the Orange Park meeting, the "wrong guy" timing, the "C-Dot" label, and the facts regarding the Statiroudis shooting went to the heart of that inquiry. By repeatedly preventing counsel from using those statements in the ordinary, impactful way allowed by the rules the district court deprived the jury of the most powerful evidence of Morales's inconsistency.

Because Morales's testimony was indispensable to the Government's case on both homicides, and because there was no strong independent corroboration of Healy's alleged orders, the Government cannot show that these Confrontation Clause violations were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also*, *Van Arsdall*, 475 U.S. at 684. The limitations on cross-examination "may well have made the difference between conviction and acquittal." *Davis*, 415 U.S. at 317. Reversal is required.

## VII. THE GOVERNMENT VIOLATED *BRADY* AND RULE 16 BY WITHHOLDING COOPERATING WITNESS ROBINSON'S CELL-PHONE RECORDS TILL THE EVE OF TRIAL

The Government's handling of Matthew Robinson's cell-phone records violated both its constitutional disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its continuing duty of prompt disclosure under Federal Rule of Criminal Procedure 16(c). *Brady*, 373 U.S. at 87; Fed. R. Crim. P. 16(c). The records at issue—historical cell-site and usage data for Robinson's phone—were in the Government's possession since 2018 and were expressly requested by the defense. AP 64-94. Yet were not produced until the eve of trial, when the prosecution dumped approximately 3,000 pages of material that included the phone records without any meaningful identification or highlighting of their significance. That tactic deprived the defense of a fair opportunity to investigate, retain an expert, and integrate the records into its trial strategy.

The late production violated Rule 16's requirement of timely disclosure. Rule 16 requires the Government, upon request, to disclose documents and data within its possession, custody, or control that are material to preparing the defense or that it intends to use in its case-in-chief, and imposes a continuing duty to "promptly disclose" additional material discovered before or during trial. Fed. R. Crim. P. 16(a)(1)(E),(c). Robinson's phone records plainly satisfied that standard. The Government used Robinson as a central courier witness and relied on his movements

and contacts to tie Healy to shipments and timing of the alleged motive to kill Statiroudis. Yet despite obtaining the records in 2018, the Government did not produce them until just before jury selection, folded into a last-minute production of roughly 3,000 pages. That is the opposite of prompt disclosure and contravenes Rule 16's purpose of allowing meaningful pretrial preparation.

The delayed disclosure violated *Brady* and *Giglio* because Robinson's phone data was favorable and material to the defense. *Brady* requires the Government to disclose, in time for effective use, evidence favorable to the accused, including impeachment evidence about key cooperators. *Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). Here, Robinson's cell-site and usage records were classic *Brady* and *Giglio* material in at least two ways: (1) they provided objective data to test and impeach Robinson's account of his movements, communications, and timing surrounding the Chicago plane seizure and his interactions with Healy, and (2) they bore directly on the Government's motive theory and the timeline it advanced to justify forfeiture by wrongdoing and the alleged urgency to kill Statiroudis. The Government's decision to sit on this data for years, then "disclose" it only days before trial effectively suppressed it.  Burying favorable information in an undigested mass of last-minute discovery does not satisfy *Brady*.

The timing and manner of disclosure caused prejudice and satisfies *Brady*'s materiality standard. Evidence is material when there is a reasonable probability that, had it been disclosed earlier, the result of the proceeding would have been different, or at a minimum that the defense's strategy and presentation would have been meaningfully altered. *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995). Had Robinson's phone records been produced when obtained in 2018, the defense could have: (1) retained a cell-site expert to analyze location patterns and timing; (2) confronted Robinson with inconsistencies between his testimony and objective phone data; (3) challenged the Government's chronology linking Robinson's arrest, Statiroudis's alleged cooperation, and the decision to kill Statiroudis; and (4) sought to exclude or limit the forfeiture-by-wrongdoing theory and other motive evidence premised on Robinson's uncorroborated narrative.

On the eve of trial, however, defense counsel was forced to triage thousands of pages while simultaneously preparing openings, cross-examinations, and *in-limine* issues, making it practically impossible to exploit the records' impeachment and exculpatory value. Courts have recognized that disclosure so late that the defense cannot use the material effectively is functionally equivalent to suppression and violates *Brady*.

Finally, the Government cannot excuse this violation by pointing to the mere fact of pretrial production. The Third Circuit has rejected the notion that a defendant

57

bears a "scavenger" duty to sift through massive discovery for undisclosed *Brady* nuggets. Indeed, the duty to disclose favorable evidence is the Government's, and it is "absolute—it does not depend on defense counsel's actions." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 289–90 (3d Cir. 2016) (en banc). Here, the prosecution knew both that Robinson was a centerpiece cooperator and that his phone records could be used to test his credibility and the Government's timeline, yet waited until the brink of trial to bury those records in a 3,000-page dump. Under *Brady*, *Giglio*, and Rule 16, that conduct violated the Government's disclosure obligations and prejudiced the defense's ability to confront a key witness and contest the Government's central narrative of motive and forfeiture, warranting a new trial.

## VIII. THE RECENT SUPREME COURT RULING IN *BARRETT V. UNITED STATES* REQUIRES THAT CUMULATIVE CONVICTIONS AND SENTENCES UNDER 18 U.S.C. 924(C) AND 924(J) MUST BE VACATED

Under the Double Jeopardy Clause, as interpreted in *Brown v. Ohio*, 432 U.S. 161 (1977), and the Supreme Court's recent decision in *Barrett v. United States*, 607 U.S. __ (2026), Healy cannot stand convicted and sentenced under both 18 U.S.C. § 924(c) and § 924(j) for the same firearm use tied to the same predicate offenses. Section 924(j) punishes causing death "in the course of a violation of subsection

58

(c)," and *Barrett* holds that the elements of a § 924(c)(1)(A) offense are a subset of the elements of a § 924(j) offense, making § 924(c) a lesser-included offense of § 924(j) under *Blockburger* absent a clear statement authorizing cumulative punishment—which the Court found lacking, especially in light of *Lora v. United States*, 599 U.S. 452 (2023). *Blockburger v. United States*, 284 U.S. 299 (1932).

Here, each § 924(c) count is paired with a § 924(j) count based on the same shooting and the same VICAR murder predicate: Count Three (§ 924(c)) is the § 924(c) violation incorporated into Count Four (§ 924(j)) for the Martinez killing; Counts Seven and Eight do the same for Statiroudis; and Counts Ten and Eleven for Colon. The Government never argued, and the jury was never instructed, that the § 924(c) counts rested on any distinct firearm conduct or different predicate offenses, so under *Barrett* and this Court's Double Jeopardy precedent, *see, e.g., United States v. Rigas*, 605 F.3d 194, 204–05 (3d Cir. 2010), one of each overlapping pair must be vacated. The proper remedy is to vacate the lesser-included § 924(c) convictions (Counts Three, Seven, and Ten) as multiplicitous and remand for resentencing on the remaining § 924(j) counts, consistent with *Barrett*.

The Government cannot show this Double Jeopardy violation was harmless. *Brown* and *Barrett* treat multiple convictions for the same offense as a *per se* constitutional problem, not a trial-type error subject to harmless-error review. *Brown v. Ohio*, 432 U.S. 161, 169 n.8 (1977); *see also, Barrett v. United States*, 607 U.S.

59

244, 255–56 (2026). In any event, the duplicative § 924(c) and § 924(j) counts materially increased Healy's punishment by stacking mandatory-minimum and life-equivalent sentences for the same firearm conduct, in direct conflict with *Brown, Lora*, and this Court's decision in *Chorin*. *Lora v. United States*, 599 U.S. 452, 455–56 (2023); *United States v. Chorin*, 322 F.3d 274, 282–83 (3d Cir. 2003). Under *Barrett* and *Brown*, the appropriate remedy is to vacate the lesser-included § 924(c) convictions in Counts Three, Seven, and Ten as multiplicitous of the corresponding § 924(j) counts and remand for resentencing on the remaining counts.

## IX. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN JURY INSTRUCTIONS ON RICO CONSPIRACY AND MURDER IN AID OF RACKETEERING

For RICO conspiracy under 18 U.S.C. § 1962(d), the Government had to prove that Healy knowingly agreed to participate in the affairs of an enterprise through a pattern of racketeering activity, not merely that he associated with criminals or knew someone would commit crimes. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *United States v. Pungitore*, 910 F.2d 1084, 1132–33 (3d Cir. 1990); *United States v. Antar*, 53 F.3d 568, 581 (3d Cir. 1995); *United States v. Riccobene*, 709 F.2d 214, 225–27 (3d Cir. 1983). The charge instead told jurors they could convict if Healy "agreed that someone—whether himself or another member—would commit at least two racketeering acts in furtherance of the

enterprise," and emphasized that he need not personally commit any predicate acts, without clearly requiring an agreement to the overall racketeering scheme. That framing allowed conviction based on proximity to a criminal setting rather than the specific conspiratorial agreement § 1962(d) and these precedents demand.

Similarly, murder in aid of racketeering under 18 U.S.C. § 1959(a) requires proof that a defendant committed, attempted, or ordered a violent crime "for the purpose of gaining entrance to, or maintaining or increasing position in" the enterprise. It is not enough that the act merely benefited or related to the enterprise. *United States v. Bergrin*, 650 F.3d 257, 268–69 (3d Cir. 2011)  and *United States v. Jones*, 566 F.3d 353, 365–66 (3d Cir. 2009). The court, however, instructed that the purpose element was satisfied if the killings were "because of" perceived cooperation and if they "helped" or "furthered" the enterprise, without requiring jurors to find that maintaining or enhancing Healy's enterprise status was a motivating purpose. In a case that turned almost entirely on incentivized cooperators and law-enforcement narratives rather than direct physical evidence, lowering the bar on both the RICO "agreement" and VICAR "purpose" elements materially eased the Government's burden where its proof was weakest, and under *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995), and *Chapman v. California*, 386 U.S. 18, 24 (1967), those errors cannot be deemed harmless.

61

Here, the Government's proof on both the RICO conspiracy and VICAR counts depended on the jury accepting the narratives of cooperating witnesses and law-enforcement agents, in the absence of direct physical or forensic evidence tying Healy to the killings or to specific racketeering acts. By lowering the threshold for what constituted a RICO "agreement" and a VICAR "purpose," the instructions materially eased the Government's burden on the very elements where its proof was weakest. Specifically:

> On RICO conspiracy, the jury could convict if it believed Healy associated with people engaged in racketeering and knew that "someone" would commit predicate crimes, without finding that he personally agreed to facilitate the enterprise through a pattern of such crimes.

> On VICAR, the jury could convict if it believed the killings were "because of cooperation" or otherwise related to the enterprise, without deciding that maintaining or enhancing Healy's position in the enterprise was a substantial purpose of the acts. AP 141.

Again, in a case tried to an anonymous jury, dominated by incentivized cooperators and hearsay, those instructional shortcuts cannot be viewed as harmless. The jury to convict based on association and generalized enterprise context rather than the specific mental states required by §§ 1962(d) and 1959(a). Because the instructions misstated essential elements and there is a reasonable probability that properly instructed jurors would have reached a different result, the RICO conspiracy and VICAR convictions must be vacated and the case remanded for a new trial on those counts.

**X.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN A VICAR CONVICTION FOR THE KILLING OF JUAN MARTINEZ**

**A.    VICAR Requires a Purpose to Maintain or Increase Position**

VICAR requires proof beyond a reasonable doubt that the defendant committed, caused, or ordered a violent crime "for the purpose of gaining entrance to, or maintaining or increasing position in" a RICO enterprise.  It is not enough that the act merely occurred in an enterprise setting or incidentally benefited the enterprise. 18 U.S.C. § 1959(a); *United States v. Urban*, 404 F.3d 754, 767–70 (3d Cir. 2005); *United States v. Thai*, 29 F.3d 785, 817–18 (2d Cir. 1994); *United States v. Bruno*, 383 F.3d 65, 83–84 (2d Cir. 2004).

**B.    Juan Martinez Was Not Killed for Any Enterprise-Related Purpose**

The Government's theory and proof showed that Juan Martinez was an unintended bystander, not an informant, rival, or enterprise member, and that Healy neither knew nor targeted him. Tragically, Martinez was mistaken for someone else. VICAR does not reach accidental bystander deaths simply because they occur during an enterprise-related episode. The killing itself must be undertaken to gain, maintain, or increase enterprise status, which Martinez's death plainly did not do.

The Government effectively asked the jury to treat Martinez's death as VICAR-qualifying because it was a foreseeable consequence of an enterprise

63

dispute, however § 1959(a) does not recognize transferred purpose or allow foreseeability to substitute for the required intent. *United States v. Pimentel*, 346 F.3d 285, 295–96 (2d Cir. 2003) (VICAR purpose is satisfied only if "a substantial purpose" of the act was to gain entrance to, or maintain or increase position; "murder while a gang member is not necessarily a murder for the purpose of maintaining or increasing position in a gang, even if it would have the effect of doing so") *United States v. Banks*, 514 F.3d 959, 965 (9th Cir. 2008) (adopting Pimentel's formulation and rejecting the idea that mere benefit to the gang is enough).

. Martinez's killing neither silenced a witness, intimidated rivals, nor enhanced anyone's position. If anything, it undermined enterprise interests by provoking law-enforcement scrutiny, underscoring the absence of VICAR purpose.

### C.    The Government Failed to Prove That Healy Ordered or Committed the Killing of Juan Martinez

Even apart from purpose, the evidence did not establish that Healy ordered or committed Martinez's killing.  There was no weapon, ballistics, location data, communications, or neutral identification tying him to the shooting, only shifting, uncorroborated accounts from heavily incentivized cooperators. Under Jackson v. Virginia, the question is whether, viewing the evidence in the light most favorable to the government, any rational juror could find the elements beyond a reasonable doubt, 443 U.S. 307, 319 (1979), and this Court's en banc decision in *United States*

64

*v. Caraballo-Rodriguez* requires that sufficiency review remain "highly deferential" and that a conviction be sustained only if the inference of guilt rises above the "threshold of bare rationality," 726 F.3d 418, 430–32 (3d Cir. 2013) (en banc).

### D. Allowing the Martinez VICAR Conviction to Stand Would Expand § 1959 Beyond Its Limits

Allowing the Martinez VICAR conviction to stand would effectively convert § 1959(a) into a strict-liability regime for any death tangentially connected to enterprise activity, contrary to *Urban* and this Court's warning against liability untethered from statutory elements. *Urban*, 404 F.3d at 767–70; *United States v. Fattah,* 914 F.3d 112, 183 (3d Cir. 2019). Because Martinez was not killed for an enterprise-related purpose and the evidence did not show that Healy ordered or committed his killing, the VICAR conviction on the Martinez count is legally insufficient and must be vacated with entry of a judgment of acquittal under *Burks v. United States*, 437 U.S. 1, 18 (1978).

## XI. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE GUILT BEYOND A REASONABLE DOUBT

### A. Governing Standard and the Nature of the Government's Proof

A conviction may stand only if, viewing the evidence in the light most favorable to the Government, a rational juror could find each essential element of each offense proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

65

319 (1979); *see also*, *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–32 (3d Cir. 2013) (*en banc*). In assessing sufficiency, this Court does not credit evidence that should not have been admitted, and it does not permit "speculation or conjecture" to fill gaps in the proof.

## B. No Direct Evidence Linking Healy to the Killings

Here, the Government presented no physical, forensic, or electronic evidence tying Healy to the charged murders or narcotics conspiracy. There was no weapon, no DNA, no fingerprints, no location data, no contemporaneous communications directing violence. Its case rested on incentivized cooperating witnesses, law-enforcement "narrative" testimony, and hearsay admitted only because of an erroneous forfeiture-by-wrongdoing ruling and misapplied co-conspirator exceptions. When those errors are corrected and improperly admitted hearsay is set aside, the record shows, at most, association and suspicion—not proof beyond a reasonable doubt.

In the absence of direct proof, the Government's theory depended on narrative: that Healy allegedly led an enterprise, that others committed violence in its name, and that he must therefore have ordered or approved the killings. But as the Supreme Court and this Court have made clear, guilt cannot be inferred from association with wrongdoers or presence in a criminal setting. Each element must be

proven as to the defendant himself. *Jackson*, 443 U.S. at 319 *see also Caraballo-Rodriguez*, 726 F.3d at 430–32.

## C. The Case Turned on Cooperators and Uncorroborated Second-Hand Accounts

The core of the Government's proof consisted of cooperating witnesses facing staggering sentencing exposure who testified pursuant to agreements that placed their liberty in the Government's hands. These witnesses repeatedly described what others allegedly "said," "believed," or "told" them about Healy's role, rather than what they personally observed. Their accounts changed over time, as reflected in evolving FBI 302s and preparation sessions, and critical aspects of their testimony—such as who ordered specific shootings and what Healy knew about alleged cooperation—were uncorroborated by independent evidence.

This Court has cautioned that while a conviction may rest on cooperator testimony in some cases, sufficiency is especially suspect where credibility is compromised and corroboration is absent, particularly when the Government's theory requires "piling inference upon inference." *Caraballo-Rodriguez*, 726 F.3d at 430–31.

Darnell Morales—the Government's central witness—is a lifelong gang member whose Mob Piru "training" as a teenager explicitly taught him to lie to law enforcement, conceal crimes, and live entirely off robberies, drugs, and theft,

67

including stealing from his own gang when it suited him. AP 1460. His incentives to fabricate here were extraordinary. Morales admitted serving as armed "cleanup crew" on the Martinez killing. AP 1439. He also understood he was "just as responsible" under aiding-and-abetting principles, helped dispose of the murder weapon. AP 1455. Yet, Morales was never charged, was made a confidential informant instead, and received years of relocation, rent, and support for himself and his family contingent on continuing to "testify" in a way that preserved those benefits. Morales's story shifted over time to match the Government's theory—on crowd size, timing, the direction of gunfire, and when he learned "the wrong person" was shot—departing in key respects from his earlier, more inculpatory grand-jury account when confronted with transcripts and physical facts. AP 1445, 1510 Most importantly, Morales never heard Healy give an order, never spoke with him, and was not allowed to interact with him. Morales's depiction of Healy as "a somebody" or "like an OG" and as tied to the Statiroudis homicide rests entirely on what other Mob Piru members supposedly said and on his own inferences from a meeting he did not overhear. AP 1494.This rendered his testimony an attenuated chain of hearsay-laden assumptions rather than reliable, first-hand evidence of Healy's guilt.

Morales provided, at most, (1) highly compromised, cooperator testimony establishing his own participation in a gang-for-hire shooting; and (2) second-hand, inference-driven claims about what others told him regarding Healy's role and

motives. No physical evidence, no independent eyewitness, and no contemporaneous communication corroborated his attribution of Healy's leadership or intent as to Healy. Under *Jackson* and *Caraballo-Rodriguez*, a conviction cannot rest on the uncorroborated word of a witness whose credibility is so thoroughly impeached, whose story shifts to accommodate the prosecution's theory, and whose only tie between the defendant and the crime is a speculative narrative built on hearsay and gang rumor rather than admissible, first-hand observation. Without the improperly admitted forfeiture and co-conspirator hearsay that supplied the missing links, Morales's testimony is insufficient as a matter of law to prove that Healy ordered, agreed to, or intended the Statiroudis killing, and it cannot carry the Government's burden beyond a reasonable doubt.

In sum, even viewed in the light most favorable to the Government, this record does not permit a rational juror to find beyond a reasonable doubt that Healy personally ordered, agreed to, or intended the murders and conspiracies charged. *Jackson* and *Caraballo-Rodriguez* allow inferences from proven facts, not verdicts built on stacked hearsay, shifting cooperator narratives, and gaps filled by conjecture. Because the Government's case never progressed beyond suspicion amplified by unreliable testimony, this Court should vacate the convictions on the homicide-related and conspiracy counts and enter judgments of acquittal, or at

69

minimum remand for a new trial at which the verdict rests on admissible, corroborated proof rather than fear-driven speculation.

### D.    Improperly Admitted Hearsay Cannot Supply Essential Elements

As detailed in the Confrontation Clause section, the Government filled critical gaps in its case with testimonial hearsay. The statements about who was cooperating, what threats existed, what Healy supposedly knew, and why violence occurred— much of which reached the jury only because the district court erroneously applied forfeiture by wrongdoing without proof that Healy specifically intended to prevent testimony, contrary to *Giles v. California*, 554 U.S. 353, 361–62 (2008), and misused Rule 801(d)(2), in violation of *United States v. Ammar,* 714 F.2d 238, 247–49 (3d Cir. 1983), by allowing hearsay statements to bootstrap themselves into admissibility as co-conspirator statements.

### E.    Impermissible Inference-Stacking Enabled by Forfeiture Bootstrapping

The Government's theory required the jury to accept a cascading series of inferences: that certain individuals were cooperating with law enforcement; that Healy knew of their cooperation; that he intended to silence testimony in order to protect or enhance his position in the enterprise; that others then committed violent acts; and that those acts were attributable to Healy as if he personally ordered or committed them.

Each link in this chain depended heavily on hearsay admitted through forfeiture or misapplied co-conspirator rules, not on independent admissible proof. This Court has warned that "inference upon inference upon inference" cannot substitute for evidence. *Caraballo-Rodriguez*, 726 F.3d at 430–31. When those stacked inferences rest on testimony that should never have been admitted, the insufficiency of the evidence is only magnified: what remains is a story, not proof beyond a reasonable doubt.

**F.    Law-Enforcement Testimony Supplied Narrative, Not Proof**

Law-enforcement witnesses testified at length, but much of their testimony concerned investigative conclusions, interpretations, and summaries of what others allegedly said, rather than personal observations of criminal acts by Healy.

Courts have recognized that limited "course of investigation" testimony may help a jury follow how an investigation unfolded, but it cannot become a back-door vehicle for introducing otherwise inadmissible hearsay or for proving elements that must rest on competent evidence. *See, e.g., United States v. Reyes*, 542 F.3d 588, 595–96 (7th Cir. 2008) (warning that using agents' narrative to relay out-of-court accusations under the guise of explaining the investigation risks violating both the hearsay rule and the Confrontation Clause). Here, the agents' testimony was used not merely to orient the jury but to justify forfeiture and to suggest guilt, effectively

71

inviting jurors to accept the Government's story as told through law enforcement rather than to decide the case based on concrete, admissible proof.

Even if this Court were to examine the evidence "as admitted," the central role of forfeiture-bootstrapped hearsay underscores why the convictions cannot stand. The Government's case becomes superficially "sufficient" only after layering in testimonial statements that should never have reached the jury under *Crawford*, *Giles*, and *Ammar*. This Court has held that where a conviction rests on evidence admitted under an erroneous legal standard, the proper remedy is reversal. The Government does not get credit for having tried the case under relaxed rules it chose to seek. *Burks v. United States*, 437 U.S. 1, 16–18 (1978).

When the record is confined to properly admissible evidence, the Government's proof does not establish who committed the killings, what role—if any—Healy played, when he formed the requisite intent, or how his actions satisfied the elements of the charged offenses. It shows only that he associated with people involved in serious crime and that cooperators, seeking leniency, later attributed leadership and responsibility to him.

Under *Jackson* and *Caraballo-Rodriguez*, no rational juror could find guilt beyond a reasonable doubt on that basis. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–32 (3d Cir. 2013) (en banc). The convictions must therefore be vacated, and for any count as to which

72

the evidence is legally insufficient once inadmissible hearsay is excluded, this Court should direct entry of a judgment of acquittal.

## XII.    THE DISTRICT COURT'S RESTRICTION ON DEFENSE SUMMATION VIOLATED THE RIGHT TO COUNSEL AND A FAIR TRIAL

Closing argument is a critical stage of a criminal trial, not a discretionary grace. Denying a meaningful opportunity to sum up "denies the defendant the basic right to make his defense." *Herring v. New York*, 422 U.S. 853, 858–59 (1975). In this unusually long and complex RICO and VICAR homicide trial—featuring multiple cooperators, years-long conspiracies, forfeiture-by-wrongdoing, and mandatory-life counts—defense summation was essential to synthesize the record, attack credibility, and explain why the proof did not meet the "beyond a reasonable doubt" standard. Yet after weeks of testimony, when defense counsel requested a modest ten-minute extension near the end of his two-hour closing, the court summarily refused—"Absolutely, positively no way"—without any case-specific justification such as juror fatigue or scheduling needs, mechanically enforcing an arbitrary time cap rather than accommodating the demands of the case. AP 2817 That restriction prevented a full and fair closing argument in violation of *Herring* and decisions cautioning against time limits that undermine effective advocacy in complex trials. *Herring*, 422 U.S. at 857, 862.

73

## CONCLUSION

For the reasons set forth above, the defendant Michael Healy respectfully submits that his convictions must be reversed.

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 15,916 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in Times New Roman, 14-point font.

3. I also certify, pursuant to Local Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies of this brief. I further certify that the electronic version of this brief, prepared for submission via ECF, has been scanned with Symantec Endpoint Protection (version 12.14112.4156) and is virus-free.

4. On this date I caused Appellant Michael Healy's brief on Appeal and & Appendix to be served by regular mail (and the brief on Appeal to be filed/served electronically). upon:

> Office of the Clerk
> United States Court of Appeals for the Third Circuit
> 21400 U.S. Courthouse
> 601 Market Street
> Philadelphia, PA 19106-1790

75

AUSA Mark Coyne
970 Broad Street
Newark, NJ 07102


/S/ Stephen Turano

Date: April 13, 2026